# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MICHAEL ELKINS**
    **Petitioner-Defendant,**

    **v.**                                 **Case No. 12-C-0781**
                                                **(Criminal Case No. 11-CR-131)**

**UNITED STATES OF AMERICA**
    **Respondent-Plaintiff.**

## RULE 4 ORDER

Petitioner Michael Elkins moves to vacate his sentence pursuant to 28 U.S.C. § 2255. Rule 4(b) of the Rules Governing Section 2255 Proceedings requires me to conduct a preliminary review of the motion:

> If it plainly appears from the motion, any attached exhibits, and the record of the prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. If the motion is not dismissed, the judge must order the United States Attorney to file an answer, motion, or other response . . . .

I first set forth the background of the case before turning to petitioner's specific claims.

## I. BACKGROUND

On June 21, 2011, the government obtained an indictment charging petitioner with three counts of making false statements in a matter within the jurisdiction of the United States Postal Service, contrary to 18 U.S.C. § 1001(a)(2) (counts one to three); five counts of providing false information to the Social Security Administration, contrary to 42 U.S.C. § 408(a)(6) (counts four to eight); five counts of causing the production of false identification documents, contrary to 18 U.S.C. § 1028(a)(1) (counts nine to thirteen); ten counts of aggravated identity theft, contrary to 18 U.S.C. § 1028A(a)(1) (counts fourteen to twenty-three, which corresponded to underlying

counts four to thirteen); and two counts of mailing threatening communications, contrary to 18 U.S.C. § 876(c) (counts twenty-four and twenty-five).

The charges arose out of a scheme petitioner devised to steal identities. On January 3, 2008, petitioner used a Wisconsin Identification Card in the name of "William J. Seymoore" to open a private mail box at a Mail Ex in Waukesha, Wisconsin.[1] The card petitioner used was an actual Wisconsin Identification Card for Seymoore (who died in October 2005), which had expired in September 1995. However, the photograph on the card was an old photograph of petitioner. Petitioner also provided Mail Ex with a fraudulent letter, purporting to be from the Bureau of Prisons ("BOP"), which indicated that Seymoore was recently released from federal prison. The letter, which bore a photograph of petitioner, provided an inmate registration number for a different individual who was then incarcerated at FMC-Lexington. The real William Seymoore had an extensive criminal record, but none of it in Wisconsin, and he never went to federal prison.

The following day, petitioner obtained a Wisconsin driver's license in the name of Marcus Siczkowycz, the husband of Elizabeth Siczkowycz, a woman petitioner met at a halfway house in March 2007 while he was finishing a federal bank fraud sentence. Using this driver's license, as well as the vehicle registration for a car driven by Mr. Siczkowycz, petitioner later opened two additional mail boxes, one at a UPS store in New Berlin, Wisconsin, and a second at a Wrap & Ship in West Allis, Wisconsin.[2]

At the same time, petitioner began mailing letters to inmates in Wisconsin prisons,

---

[1] This conduct formed the basis for count one of the indictment.

[2] This conduct formed the basis for counts two and three.

posing as an attorney "Jonathan Morgan" working for a law firm called the "Bureau of European and American Rights" or "BEAR."  In his letter, petitioner told inmates that BEAR was doing research for a client and would pay inmates $250 to complete a series of three questionnaires. The initial questionnaire, which accompanied the letter, asked the inmates to provide their prison inmate number, Social Security number, date of birth, and other personal information. Petitioner then used the inmates' information, and the mail boxes or other addresses to which he had access, to request replacement Social Security cards and certified copies of birth certificates in the inmates' names.  On several of his submissions to Social Security, petitioner included a fraudulent BOP letter similar to the one he used to open the P.O. Box in Waukesha. The letters indicated that the applicant was a federal inmate soon to be released and needing a replacement Social Security card to help obtain employment.  The BOP letters included a scanned image of a fraudulent BOP inmate identification card in the applicant's name but petitioner's photograph and the BOP registration number petitioner had previously used.

Petitioner submitted at least thirteen different applications for replacement Social Security cards, five of which formed the basis for the charges contained in counts four through eight of the indictment.  For example, count four corresponded to a January 3, 2008 application petitioner sent to the Waukesha Office of the Social Security Administration seeking a replacement Social Security card in the name of "L.A.K."  In fact, the real L.A.K. died in August 2006.  The application indicated that L.A.K. had a mailing address in Waukesha, which corresponded to the private mail box petitioner opened in Seymoore's name.  The application was accompanied by a fraudulent letter purporting to be from the BOP and included a scanned copy of a BOP inmate identification card in the name of L.A.K. but bearing petitioner's photograph and the inmate identification number of another individual, who was an actual

3

federal inmate. In connection with applying for the replacement Social Security card, petitioner provided various means of identification for L.A.K., including his name, date of birth, and Social Security number; this conduct formed the basis for the corresponding charge of aggravated identity theft in count fourteen.

Petitioner also used inmate information to obtain certified birth certificates in the inmates' names. The government identified at least eight instances where petitioner fraudulently obtained a birth certificate from the Wisconsin Department of Vital Statistics in someone else's name, five of which formed the basis for the charges set forth in counts nine through thirteen of the indictment.

On February 28, 2008, petitioner stopped reporting to his probation officer and absconded.[3] He was arrested on April 24, 2008 in Illinois, where he was living with Ms. Siczkowycz.[4] After petitioner's arrest, Ms. Siczkowycz turned over to her supervising probation officer numerous documents belonging to petitioner, including thirteen birth certificates, ten completed BEAR questionnaires from Wisconsin inmates, two Social Security cards belonging to other individuals, the expired Seymoore Wisconsin ID Card, and notebooks containing lists of personal information for numerous people. New Berlin police later recovered three birth certificates from the mail box petitioner opened at the UPS store. Federal agents also

---

[3] Petitioner completed his federal bank fraud prison sentence in September 2007 and commenced a five year term of supervised release.

[4] Following his arrest, the probation office filed a petition to revoke petitioner's supervised release in the bank fraud case, alleging that while on supervision he assumed the identity and was working under the name of an individual who was incarcerated in Wisconsin; that he obtained a Social Security card, driver's license, and opened a bank account in this name; and that he fraudulently withdrew $7500 from a bank account belonging to Elizabeth Siczkowycz's husband. On May 1, 2009, another judge of this district court revoked petitioner and sentenced him to 36 months in prison.

4

recovered a birth certificate from the mail box in West Allis. Ms. Siczkowycz later turned over to federal agents two flash drives that contained information used by petitioner, including scanned images of fraudulent BOP and Wisconsin DOC ID cards, lists of personal information for most of the people he used to get replacement Social Security cards, the BEAR cover letter and questionnaire, and fraudulent BOP and DOC letterhead.

The threat charges in counts twenty-four and twenty-five pertained to letters petitioner sent to Elizabeth Siczkowycz's ex-husband and sister, as well as the children of her brother. Each of the letters was a sympathy card, in which defendant drew a picture of two scales. On one side of one of the scales was a list of various items (television, furniture, tools, etc.) that petitioner apparently believed Mr. Siczkowycz had. On the other side of the scale was a zero. On the second scale, the same list of personal items appeared on one side and the names of the recipients' children or simply "two sons" on the other side. The words "street justice" were written at the bottom of this second scale. Each of the sympathy cards bore standard phrases such as "So Sorry for Your Loss" or "You Have Lost Someone Very Special and its Going to Take Time to Ease the Sadness you are Feeling now." Petitioner then added the following phrases. On the card to addressed to Siczkowycz's husband (count twenty-four), he wrote: "I cannot imagine losing both of my children and knowing at the same time, that it was all because of my bad choices and wrong actions that caused it. I do not think I could live with myself knowing I caused it for just material items!!" On the card addressed to Siczkowycz's sister (count twenty-five), he wrote: "I feel so sorry for your loss of both sons, especially knowing that it was your own greed of mere objects (that belonged to someone else) that caused your loss of both kids." On the card addressed to the children of Siczkowycz's brother, he wrote: "I miss you both and cannot wait to come see you very, very, soon. I will try to come

5

see you after school, and we can go have some fun.  Your friend, Mike."

The envelopes for these letters contained a return address for Jackson Correctional in Black River Falls, the institution where petitioner was incarcerated at the time the letters were sent.  However, the letters were postmarked from Columbus, Ohio, where petitioner's sister lived.  She was interviewed and admitted receiving a package from petitioner that contained several sealed letters, which she mailed at his request.

On July 25, 2011, petitioner appeared for arraignment on the indictment, entering not guilty pleas, and the case was set for final pre-trial on September 23, 2011, and trial on October 3, 2011.  On August 15, 2011, petitioner filed a motion to sever counts twenty-four and twenty-five (the threat counts).  On September 8, 2011, the magistrate judge handling pre-trial proceedings in this case granted that motion.  However, on September 20, 2011, the parties filed a plea agreement, and the court converted the final pre-trial to a change of plea hearing.

In the plea agreement, petitioner agreed to plead guilty to counts four, fourteen, and twenty-four. (Plea Agreement ¶ 4.)  He admitted that the facts set forth in the plea agreement (recounted above) were true and correct and established his guilt beyond a reasonable doubt. (Id. ¶ 5.) The parties also agreed to recommend various guideline calculations, which produced a final offense level of 13 on counts four and twenty-four.  (Plea Agreement ¶¶ 18-26.)  The parties acknowledged that count fourteen required a two year consecutive sentence.  (Id. ¶ 29.) The government agreed to recommend a total sentence of 60 months.  Petitioner reserved the right to request that the sentence on counts four and twenty-four run concurrently with his federal revocation sentence; the government agreed to take no position on this request.  (Id.) The government further agreed to dismiss the remaining counts of the indictment at sentencing.  (Id. ¶ 8.)

6

On September 23, 2011, petitioner entered guilty pleas to count four (providing false information to the Social Security Administration), count fourteen (aggravated identity theft), and county twenty-four (mailing threatening communications). During the plea hearing, petitioner assured me that he had enough time to talk to his lawyer and was satisfied with counsel's advice. (Plea Hr'g Tr. at 3.) He further assured me that he had received a copy of the indictment, gone over it with his lawyer, and understood the charges and what the government would have to prove to obtain a conviction. (Id.) He also verified that he understood the various rights he relinquished by pleading guilty, including the right to trial. (Id. at 4.) Petitioner then assured me that he had read over the plea agreement, talked to his lawyer about it, came to an understanding of it, and then signed it. (Id.) He verified that he understood the penalties he faced, that I was not bound to impose any particular sentence, and that he would not be able to withdraw his plea based on disagreement with the sentence. (Id. at 4-5.) He next assured me that no one had forced him or threatened him to get him to plead, or promised him anything other than what was in the plea agreement, and that he was doing so voluntarily. (Id. at 5.) Finally, he admitted that the facts set forth in the plea agreement about what he did were substantially correct, and that he was pleading guilty because he was guilty. (Id. at 5-6.) I accepted petitioner's guilty pleas to counts four, fourteen, and twenty-four, ordered a pre-sentence report ("PSR"), and set the case for sentencing. Petitioner withdrew his severance motion as moot. (Id. at 6.)

The PSR recommended the same guideline calculations as the parties in their plea agreement. Specifically, on count four, the PSR set a base offense level of 6, U.S.S.G. § 2B1.1(a)(2), then added 2 levels under § 2B1.1(b)(2)(A)(i) based on the number of victims, 2 levels under § 2B1.1(b)(9)(A) because petitioner purported to act on behalf of a governmental

7

agency, 2 levels under § 2B1.1(b)(10)(C) for use of sophisticated means, and 2 levels under § 2B1.1(b)(11)(C)(ii) because petitioner possessed five or more means of identification, for an adjusted level of 14. On count twenty-four, the PSR set a base offense level of 12 under U.S.S.G. § 2A6.1(a)(1), then added 2 levels under § 2A6.1(b)(2)(A) because the offense involved more than two threats, for an adjusted level of 14. The PSR applied the multi-count adjustment in U.S.S.G. § 3D1.4, producing 2 units and a combined adjusted level of 16, then subtracted 3 levels for acceptance of responsibility under § 3E1.1, for a final level of 13. Coupled with defendant's criminal history category of VI, level 13 produced an imprisonment range of 33-41 months. The guideline range on count fourteen was the term of imprisonment required by statute – 2 years consecutive. U.S.S.G. § 2B1.6.

At the February 10, 2012 sentencing hearing, I advised the parties of an apparent guideline calculation error in the PSR's assessment of the 2 level enhancement under U.S.S.G. § 2B1.1(b)(11)(C)(ii) for possession of five or more means of identification. The facts supported the enhancement, but the guidelines provide that when a defendant also pleads guilty to aggravated identity theft under 18 U.S.C. § 1028A, the court should not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense. See U.S.S.G. § 2B1.6 cmt. n.2. However, I noted that even if petitioner did not receive the § 2B1.1(b)(11)(C) enhancement (which dropped the adjusted level on count four from 14 to 12), given the manner in which U.S.S.G. § 3D1.4 operated in this case, the final offense level was the same. The parties agreed with this assessment. Petitioner's counsel specifically stated: "And for the record, Your Honor, I've reviewed that correction with my client and we understand that it -- we believe that it's valid and we understand that it doesn't affect the guideline range." (Sen. Hr'g Tr. at 2-3.)

I asked petitioner's counsel whether he and petitioner had gone over the PSR, and counsel replied, "We have, Your Honor." (Id. at 2.) Counsel also verified that, other than what had previously been filed in writing, the defense had no further objections to the PSR. (Id.) I addressed petitioner's objections and clarifications, finding that they did not affect the guideline range, and otherwise adopted the calculations set forth in the PSR without objection, producing a range of 33 to 41 months on counts four and twenty-four, and 2 years consecutive on count fourteen. (Id. at 3-5.) On consideration of the factors under 18 U.S.C. § 3553(a), I imposed a sentence of 31 months on counts four and twenty-four running concurrently with each other and concurrently with petitioner's federal revocation sentence, and 24 months on count fourteen, running consecutively to all other sentences, for a total of 55 months. (Id. at 26-31.)

I signed the judgment on February 13, 2012, and petitioner, through counsel, filed a notice of appeal the following day. On February 15, 2012, I received a letter from petitioner, pro se, in which he claimed a different guideline error in his case. Specifically, he argued that he should not have received the 2 level enhancement for number of threats under U.S.S.G. § 2A6.1(b)(2). He claimed that because he was charged with just two counts under 18 U.S.C. § 876(c), he could not receive an enhancement for making three threats. In an order dated February 21, 2012, I rejected petitioner's contention, noting that guideline enhancements are not limited by the number of counts with which the defendant was charged or on which he was convicted.[5] I further noted that in his plea agreement petitioner admitted that he mailed three threatening cards (Plea Agreement at 7); he also agreed to affirmatively recommend the 2 level

---

[5] I indicated that the letter could be construed as a motion under Fed. R. Crim. P. 35(a).

9

increase under § 2A6.1(b)(2) because his relevant conduct involved more than two threats (Plea Agreement at 12 ¶ 23). Petitioner also seemed to assume that with a lower guideline range he would be entitled to a comparably lower non-guideline sentence, which, of course, did not follow.

On July 9, 2012, the Seventh Circuit dismissed petitioner's direct appeal on his Fed. R. App. P. 42(b) motion. He filed the instant § 2255 motion on July 31, 2012. In the motion, petitioner alleges that (1) his lawyer failed to meet with him to review the PSR, which prevented him from noticing the U.S.S.G. § 2A6.1(b)(2) number of threats issue; (2) his lawyer misled him on the law regarding U.S.S.G. § 2A6.1 enhancements; (3) he was denied the right to go to trial on counts twenty-four and twenty-five; and (4) he was denied discovery, the testing of evidence, and contact by counsel with a family member (his sister) coerced into cooperating with the government. He asks that he be re-sentenced to 25 months on counts four and twenty-four, or returned to court to redo the plea process.

## II. DISCUSSION

**A.    Applicable Legal Standards**

Section 2255 provides a basis for attacking a federal sentence on the grounds that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." Almonacid v. United States, 476 F.3d 518, 521 (7th Cir. 2007). Consequently,

it provides relief based only on legal errors that are jurisdictional, constitutional, or constitute a fundamental defect which inherently results in a complete miscarriage of justice. Oliver v. United States, 961 F.2d 1339, 1341 (7th Cir. 1992).

Generally, claims not raised on direct appeal may not be litigated collaterally. See, e.g., Fuller v. United States, 398 F.3d 644, 648 (7th Cir. 2005). However, ineffective assistance of counsel claims may be raised for the first time under § 2255. See Massaro v. United States, 538 U.S. 500, 504 (2003). In order to establish an ineffective assistance claim, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 688 (1984). To meet the performance prong, the petitioner must come forward with specific acts or omissions falling outside the wide range of competent assistance under prevailing professional norms. Coleman v. United States, 318 F.3d 754, 758 (7th Cir. 2003). Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption of effectiveness in order to combat the distorting effects of hindsight and considering the reasonableness of counsel's conduct in the context of the case as a whole. Atkins v. Zenk, 667 F.3d 939, 944-45 (7th Cir. 2012); Valenzuela v. United States, 261 F.3d 694, 698-99 (7th Cir. 2001). In order to establish prejudice, the petitioner must show that there is a reasonable probability that but for his counsel's mistakes, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable. Yu Tian Li v. United States, 648 F.3d 524, 527 (7th Cir. 2011).

The district court may deny a § 2255 motion without holding a hearing or requiring the government to respond if the petitioner makes conclusory or speculative allegations rather than specific factual allegations. Gallo-Vasquez v. United States, 402 F.3d 793, 797 (7th Cir. 2005)

(citing Daniels v. United States, 54 F.3d 290, 293 (7th Cir. 1995)). The court may likewise summarily deny a motion resting on factual allegations that are contrary to the record. See Eaton v. United States, 458 F.2d 704, 706 (7th Cir. 1972); see also Cooper v. United States, 378 F.3d 638, 641-42 (7th Cir. 2004).

**B.     Analysis**

### 1.     Review of PSR/U.S.S.G. § 2A6.1(b)(2) Claim

Petitioner first argues that his lawyer failed to meet with him to go over the entire PSR, as required by law to ensure that he was aware of the facts and guideline calculations within it. He contends that had he been given sufficient time to review the report he would have noticed that an uncharged threat was illegally used to enhance the punishment under U.S.S.G. § 2A6.1(b)(2). This, he contends, prevented him from obtaining a 4 level reduction under U.S.S.G. § 2A6.1(b)(6).[6] He states that he was not charged with more than two threats in the indictment, and that it was only after the PSR was filed with the court that he learned about the third threat (which he argues was not actually a threat).

Petitioner's claim that counsel failed to review the PSR with him is contrary to the record. At the sentencing hearing, I asked whether counsel had gone over the PSR with petitioner, and counsel said that he had. At no point during the sentencing hearing did petitioner express any disagreement with this statement or otherwise ask for more time to review the report. Petitioner presents no evidence supporting his claim in this regard.

Petitioner also fails to demonstrate prejudice. He cites no authority supporting his

---

[6]Section 2A6.1(b)(6) provides: "If (A) subsection (a)(2) and subdivisions (1), (2), (3), (4), and (5) do not apply, and (B) the offense involved a single instance evidencing little or no deliberation, decrease by 4 levels."

12

assumption that guideline enhancements must be strictly based on charged conduct.[7]  See, e.g., United States v. Jones, 635 F.3d 909 (7th Cir. 2011).  Nor does he acknowledge that, in the plea agreement, he factually admitted that he made the third threat, which also targeted the Siczkowycz family.  He further agreed to affirmatively recommend a 2 level enhancement under U.S.S.G. § 2A6.1(b)(2) based on the number of threats he made.

Petitioner's claim that he learned about the third threat only after the PSR came out is also flatly contradicted by the record.  At the plea hearing, petitioner assured me that he had read over the plea agreement and understood its contents; he also confirmed that the facts set forth in the plea agreement about what he did (including the third threat) were correct.[8]

---

[7]On page 15 of his motion, petitioner cites various Seventh Circuit decisions remanding for re-sentencing based on guideline errors, but none address his specific situation.  He also cites Johnson v. Uribe, 682 F.3d 1238 (9th Cir. 2012), but that case concerned ineffective assistance in the plea negotiation stage, resulting in a statutorily illegal sentence.  The court held that the appropriate remedy was vacating the conviction and allowing a new trial, not merely re-sentencing.  Petitioner makes no similar claim here.  His sentence is well within statutory limits, and he primarily seeks re-sentencing to a 25 month term on counts four and twenty-four.  He makes no showing that counsel provided ineffective assistance in negotiating the plea; indeed, the agreement counsel obtained was quite favorable, as the government agreed not to oppose concurrent time on counts four and twenty-four and to dismiss all of the other counts, including nine of the ten § 1028A counts (saving petitioner 18 years of exposure).  Petitioner provides no basis for permitting him to "redo the plea process." (Motion at 15.)  Petitioner argues that I violated Rule 11 by not explaining the enhancements, but the Rule does not require the judge to do that.  Petitioner also argues that I erred in not "allowing for a review on the illegal enhancements [I] discovered in § 1028(a)(1) and to seek a review of the file to insure no other illegal enhancements were being presented." (Motion at 15.)  How I erred in spotting and correcting a guideline error in petitioner's favor is unexplained, as is the suggestion that I somehow foreclosed a further review of the record for additional errors.  The parties were free to present any arguments or objections to the PSR they wished; they had access to the same file I did.

[8]Petitioner never explains how – even if the number of threats enhancement were to be vacated – he would qualify for the 4-level reduction under § 2A6.1(b)(6), and given the manner in which he went about threatening the Siczkowycz family this is hardly self-evident.  Petitioner also seems to assume that, without the 2 level enhancement under § 2A6.1(b)(2), he is entitled to a lower non-guideline sentence of 25 months.  Absent the enhancement under §

13

### 2. Law Regarding U.S.S.G. § 2A6.1 Enhancements

Petitioner next claims that his lawyer misled him on the law regarding U.S.S.G. § 2A6.1 enhancements. He states that counsel told him that the § 2A6.1(b)(2) enhancement applied based on two or more threats. Petitioner states that after he was temporarily returned to federal custody and allowed access to law books he made a copy of the guideline and showed his lawyer that the provision required more than two threats. Petitioner contends that counsel told him that this did not matter, as count four carried a base level of 14 (resulting in the same final level after application of U.S.S.G. § 3D1.4). At sentencing, I corrected the level on count four to 12 but stated that this did not change the final range given the level on count twenty-four (14) and the operation of U.S.S.G. § 3D1.4. Petitioner states that both counts should have been set at level 12.

I first note that in making this claim petitioner states that he raised the number of threats issue with his lawyer prior to sentencing; this contradicts his first claim that counsel's failure to meet with him and review the PSR prevented him from spotting the issue. In any event, the claim lacks merit. To the extent that petitioner alleges that his lawyer misadvised him about § 2A6.1(b)(2), the plea agreement clearly states that the enhancement applies because petitioner's "relevant offense conduct involved <u>more than two threats</u>." (Plea Agreement ¶ 23,

---

2A6.1(b)(2), the adjusted level on counts four and twenty-four would be 12; after the 2 level increase produced by U.S.S.G. § 3D1.4 and the 2 level decrease under § 3E1.1, the final level would be 12 and the range 27-33 months. Petitioner's sentence of 31 months falls within that range, and he fails to demonstrate any reasonable probability that I would have imposed a lower term on consideration of the 18 U.S.C. § 3553(a) factors, particularly given the extent of his fraudulent scheme, the disturbing nature of the threats, and his substantial prior record. Nor does he demonstrate that the sentence I imposed was based on a specific reduction from the low end of the adopted guideline range, as in <u>Emezuo v. United States</u>, 357 F.3d 703, 711 (7th Cir. 2004). The sentence in this case was ultimately based on § 3553(a), under which the court is permitted and required to consider all relevant facts and circumstances.

14

emphasis added.) The agreement further states that petitioner "acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to [his] satisfaction." (Id. ¶ 14.) Petitioner confirmed his understanding of the plea agreement during the Rule 11 hearing, and a claim that can succeed only if the defendant lied to the judge during the plea colloquy may be rejected out of hand unless the defendant has a compelling explanation for the contradiction, United States v. Peterson, 414 F.3d 825, 827 (7th Cir. 2005), which petitioner does not offer. Finally, as discussed above, petitioner's claim regarding the number of threats enhancement fails.

### 3. Trial on the Severed Counts

Petitioner further claims that he was denied the right to proceed to trial on the two threat counts, which had been severed from the other charges in the indictment. He states that he intended to proceed to trial on the § 876 counts but was told that if he wanted a plea agreement on the other twenty-three counts (which he had already admitted at his 2009 revocation hearing) he was required to waive severance and plead out to all counts or none at all. He argues that he was denied the right to trial under threat of a harsher punishment based on the prosecution of all twenty-three remaining counts, whereas if he waived his rights some counts would be dropped. He claims that counsel again failed to advise him of his rights.

The Rule 11 colloquy demonstrates that petitioner entered his pleas voluntarily, without threat or coercion, and he offers no good reason why I should now re-open the proceedings and allow him to plead anew. See United States v. Stewart, 198 F.3d 984, 986-87 (7th Cir. 1999) (holding that the court need not hold a hearing to permit the defendant to contradict statements freely given during the plea colloquy). Nor does petitioner provide any authority supporting a claim that it was improper for the government to require resolution of all charges

15

as part of a plea agreement. Prosecutors need not offers plea bargains at all, <u>United States v. Hall</u>, 212 F.3d 1016, 1022 (7th Cir. 2000),[9] much less agreements as favorable as petitioner's. As indicated, the government agreed to dismiss nine of the ten aggravated identity theft counts, each of which could have added two years consecutive to his sentence; the government also agreed not to oppose concurrent time on counts four and twenty-four.

Petitioner does not specify how counsel failed to guard his rights. In any event, I clearly told petitioner during the colloquy that he had a right to plead not guilty, persist in that plea, and have a jury trial. He voluntarily chose to give up those rights. <u>See</u> <u>United States v. Martinez</u>, 169 F.3d 1049, 1054 (7th Cir. 1999) (finding no prejudice where the district judge accurately advised the defendant during the colloquy, correcting any alleged misstatement by counsel).

### 4.     Discovery, Testing, and Investigation

Finally, petitioner claims that he was denied discovery, the testing of evidence, and contact by counsel with a family member used as a government witness under threat of prosecution. He notes that two flash drives were used against him, yet counsel refused to have them tested as to the date the information was loaded onto them; he alleged that it was after his arrest, by a co-defendant who was never charged and worked with the government. Counsel also allegedly refused to contact petitioner's sister in Ohio to learn that she was threatened into writing a statement or facing arrest. Petitioner also claims that he was denied the right to review any of the discovery because counsel said it was too voluminous to copy.

In order to establish prejudice based on counsel's alleged failure to investigate, the

---

[9]Nor does the court assume that prosecutors act vindictively by enhancing charges following the defendant's exercise of a procedural right. <u>See</u> <u>United States v. Bullis</u>, 77 F.3d 1553, 1559 (7th Cir. 1996).

16

defendant must supply sufficiently precise information regarding what the investigation would have produced and how the results could have aided his defense. See, e.g., United States v. Farr, 297 F.3d 651, 658-59 (7th Cir. 2002); United States v. Rodriguez, 53 F.3d 1439, 1449 (7th Cir. 1995); United States v. Olson, 846 F.2d 1103, 1109-10 (7th Cir. 1988). Petitioner fails to do that here.

Aside from a vague claim that someone may have loaded incriminating evidence onto the flash drives after his arrest, petitioner offers no reason to believe that testing of the drives would have aided his defense.[10] See Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002) (rejecting ineffective assistance claim where the petitioner presented no evidence concerning what testing would have yielded). In any event, even without the flash drives the evidence against petitioner, set forth above, was overwhelming. Nor does petitioner provide any evidence as to what his sister would have said, had counsel interviewed her. See United States v. Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnote omitted). Finally, a guilty plea entered by a defendant who does not see the prosecution's evidence in advance will still be voluntary where, as here, it follows disclosure of an adequate factual basis. United States v. Underwood, 174 F.3d 850, 854 (7th Cir. 1999).

---

[10]Petitioner also admitted in the plea agreement that the drives contained information he used to effectuate the scheme, including scanned images of fraudulent BOP and Wisconsin DOC ID cards, lists of personal information he used to get replacement Social Security cards, the BEAR cover letter and questionnaire, and fraudulent BOP and DOC letterhead. He cannot now deny these facts.

17

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's motion is **DENIED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings, the district court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2255 petitioner. In order to obtain a COA, the petitioner must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether reasonable jurists could debate whether the motion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 484 (2000). For the reasons stated above, petitioner cannot make such a showing, so I decline to issue a COA.

Dated at Milwaukee, Wisconsin, this 9th day of August, 2012.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

18